# EXHIBIT A

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF VIRGINIA BEACH

ADEN W. SCOTT, III;
MARK C. DAVIS;
EDWARD A. LANE;
JEREMY M. POPE;
CASEY BARDEN;
JOHN HUDNALL; and
AMY L. HUTCHESON, Executrix of the Estate of
JAMES S. HUTCHESON, deceased,
         Plaintiffs,

Civil Action No. CL25- 1 9 9 9

v.                                    TRIAL BY JURY DEMANDED

3M COMPANY f/k/a
MINNESOTA MINING AND MANUFACTURING COMPANY;
AGC CHEMICALS AMERICAS, INC.;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
    Serve: Blue Ridge Rescue Suppliers, Inc.
        1060 Butler Branch Rd.
        South Prince George, VA 23805-8115

    Serve: J Lee E Osborne, RA
        Woods Rogers
        10 South Jefferson St. Suite 1400
        Roanoke, VA 24011

BRADSDEN SOLUTIONS, INC.;
Serve: Bradsden Solutions, Inc.
        1060 Butler Branch Rd.
        South Prince George, VA 23805-8115

    Serve: J Lee E Osborne, RA
        Woods Rogers
        10 South Jefferson St. Suite 1400
        Roanoke, VA 24011

DAIKIN AMERICA, INC.;
E.I. DU PONT DE NEMOURS AND
COMPANY., a/k/a EDIP, Inc.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;

FILED
CLERK'S OFFICE
VA BEACH CIRCUIT COURT

APR 1 5 2025

TINA E. SINNEN, CLERK
BY: _____ D.C.

**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**LION GROUP, INC.;**
**MALLORY SAFETY AND SUPPLY, LLC;**
**MSA SAFETY SALES, LLC;**
**MSA SAFETY INC.;**
**MUNICIPAL EMERGENCY SERVICES INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA d/b/a**
**SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC; and**
**W.L. GORE & ASSOCIATES, INC.;**

> **Defendants.**

## COMPLAINT

COME NOW Plaintiffs, Aden W. Scott III, Mark C. Davis, Edward A. Lane, Jeremy M. Pope, Casey Barden, John Hudnall, and Amy L. Hutcheson, Executrix of the Estate of James S. Hutcheson, deceased, who move this Honorable Court for judgment against Defendants 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY); AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA, INC.; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN SOLUTIONS, INC.; DAIKIN AMERICA, INC.; E.I. DU PONT DE NEMOURS AND COMPANY, a/k/a EIDP, Inc.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; LION GROUP, INC.; MALLORY SAFETY AND SUPPLY, LLC; MSA SAFETY SALES, LLC; MSA SAFETY INC.; MUNICIPAL EMERGENCY SERVICES INC.; PBI PERFORMANCE PRODUCTS, INC.; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA (d/b/a SOUTHERN MILLS INC.); THE CHEMOURS COMPANY LLC; and W.L. GORE & ASSOCIATES, INC., jointly and severally, for compensatory damages, punitive damages, costs of this action, and pre-judgment interest and post-

judgment interest together with actual damages, treble damages, and attorney's fees pursuant to the Virginia Consumer Protection Act on the grounds set forth below:

1.      This action is filed pursuant to The Multiple Claimant Litigation Act, Va. Code § 8.01-267.1, *et seq.*

2.      Plaintiffs total seven individuals joined herein as Plaintiffs in a single action.

3.      Plaintiffs' claims involve common issues of law and fact and arise out of the same series of transactions or occurrences, and their claims are properly joined in accordance with Va. Code § 8.01-267.1, *et seq.* The common questions of law or fact predominate and are significant to the actions.

4.      Joinder of all Plaintiffs' claims against Defendants herein (i) promotes the ends of justice and the just and efficient conduct and disposition of the actions; (ii) is consistent with each party's right to due process of law; and (iii) does not prejudice any individual party's right to a fair and impartial resolution of each solution.

5.      Joinder of all Plaintiffs' claims against Defendants herein will be more convenient for the parties, witnesses, and counsel than individual separate actions.

6.      All of the Plaintiffs' claims are at the initial stage of litigation, and joinder of their claims more efficiently utilizes judicial facilities and personnel and the Court's calendar, and avoids inconsistent rulings, orders and judgements.

7.      Joinder of all the Plaintiffs' claims against Defendants make prompt settlement of actions more likely and will not result in prejudice or confusion.


**BACKGROUND**

8.    The Plaintiffs are current and retired firefighters who have served various cities and municipalities in Virginia, and one spouse of a deceased firefighter.  The current and retired firefighters will be referenced to collectively throughout this Complaint as "Firefighter Plaintiffs and Decedents."

9.    Plaintiffs brings this action for harms, pursuant to Virginia Code § 8.01-50 *et seq.*, resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in protective clothing specifically designed for firefighters ("turnouts") manufactured, designed, sold supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

10.    PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAs include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

11.    PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.

12.    PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS has also been found to concentrate in human blood, bones, and organs.

13.     Unbeknownst to the Firefighter Plaintiffs and Decedents, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts").

14.     For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts to firefighting training facilities and fire departments, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach. Defendants did so, moreover, without ever informing firefighters or the public that turnouts contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

15.     The Firefighter Plaintiffs and Decedents wore turnouts in the usual and normal course of performing their firefighting duties and training and were repeatedly exposed to PFAS in their turnouts.  The Firefighter Plaintiffs and Decedents did not know and, in the exercise of reasonable diligence, could not have known that these turnouts contained PFAS or PFAS-containing materials.  The Firefighter Plaintiffs and Decedents also did not know that PFAS were in their body and blood.

16.     At all relevant times and continuing to the present, Defendants have represented that their turnouts are safe.

17.     The Firefighter Plaintiffs and Decedents used the turnouts as they were intended and in a foreseeable manner which exposed them to PFAS in the course of their firefighting activities.  This repeated and extensive exposure to PFAS resulted in the Firefighter Plaintiffs and Decedents developing various forms of cancer.

18.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that the Firefighter Plaintiffs and Decedents would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during the ordinary course of his profession, including during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

## PARTIES

### *Plaintiffs*

19.     Plaintiff Aden W. Scott III is an adult resident of the Commonwealth of Virginia. Plaintiff Scott worked as a full-time firefighter serving the City of Virginia Beach for over 14 years.  As a result of exposure to PFAS contained in his turnouts, Plaintiff Scott was diagnosed with Non-Hodgkin's Lymphoma.

20.     Plaintiff Mark C. Davis is an adult resident of the Commonwealth of Virginia. Plaintiff Davis has served as a Virginian firefighter for over 24 years, beginning with the Norfolk Fire Department in 2000, before transitioning to fire departments in Accomack County.  As a result of his exposure to PFAS contained in his turnouts, including in Globe branded turnouts, Plaintiff was diagnosed with High-Grade Ureteral Carcinoma.

21.     Plaintiff Edward A. Lane is an adult resident of the Commonwealth of Virginia. Plaintiff Lane has served as a firefighter for the City of Virginia Beach since 2011.  Prior to serving in Virginia Beach, Plaintiff Lane volunteered as a firefighter in Moyock, North Carolina.  As a result of his exposure to PFAS contained in his turnouts, including in Morning Pride branded turnouts, Plaintiff was diagnosed with medullary thyroid cancer.

22.     Plaintiff Jeremy M. Pope is an adult resident of the Commonwealth of Virginia. He is a firefighter for Walter Reed Fire Department and the Metro-Washington Airport Authority Fire and EMS Department ("Airport Authority"). As a result of his exposure to PFAS contained in his turnouts, including in Morning Pride and Globe branded turnouts, Plaintiff Pope was diagnosed with colon cancer.

23.     Plaintiff Casey Barden is an adult resident of the Commonwealth of Virginia. He has worked as a firefighter for the Henrico County Division of Fire for almost seventeen years. Plaintiff Moretz began serving in a volunteer role in Hanover County in or around 2007, before transitioning to the role full time in Henrico County in 2008. As a result of his exposure to PFAS contained in his turnouts, including in Morning Pride branded turnouts, Plaintiff was diagnosed with seminoma of testis (testicular cancer).

24.     Plaintiff John Hudnall is an adult resident of the Commonwealth of Virginia. He has worked with the Henrico County Division of Fire. As a result of his exposure to PFAS contained in his turnouts, Plaintiff was diagnosed with thyroid cancer.

25.     Plaintiff Amy L. Hutcheson, Executrix of the Estate of James S. Hutcheson, deceased, is an adult resident of the Commonwealth of Virginia. She is the widowed spouse of Decedent Hutcheson, and the Clerk of the Gloucester County Circuit Court qualified her as Executrix of Decedent Hutcheson's estate. Decedent Hutcheson worked as a firefighter serving the City of Hampton for over 25 years. Prior to working as a professional, career firefighter, Decedent Hutcheson also served as a volunteer for Gloucester County. As a result of exposure to PFAS contained in his turnouts, Decedent Hutcheson developed and later died from B-Cell Lymphoma in his brain at age 53 on May 2, 2023. Decedent Hutcheson is survived by his wife and stepson.

### *Defendants*

26.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia.  3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

27.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. AGC has its principal place of business in Exton, Pennsylvania.  AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

28.     Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

29.    Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

30.    Defendant Blue Ridge Rescue Suppliers, Inc. ("Blue Ridge") is or was a Virginia stock corporation doing business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the fire departments in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach, including Firefighter Plaintiffs and Decedents.

31.    Defendant Bradsden Solutions, Inc. ("Bradsden"), is believed to be the acquiring company or the same corporate entity under a newly registered name as Blue Ridge Rescue Suppliers, Inc. Bradsden Solutions, Inc. is a Virginia stock corporation that did business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the fire departments in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach, including Firefighter Plaintiffs and Decedents.

32.    Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and

products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

33.     Defendant E.I. du Pont de Nemours & Co., also known as EIDP, Inc. ("DuPont"), is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

34.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in Virginia. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach. Defendant MSA Safety Inc. (formerly known as "Mine Safety Appliances Company") acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

35.     Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell Int'l has its principal place of business in Charlotte, North Carolina. Honeywell International developed manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including its Morning

Pride branded turnouts, to fire departments around Virginia, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

36.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including its Morning Pride branded turnouts, to fire departments around Virginia, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

37.     Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

38.     Defendant Mallory Safety and Supply, LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in Virginia. Mallory has its principal place of business in Portland, Oregon. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

39.    Defendant MSA Safety Sales, LLC ("MSA Safety Sales") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Sales developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

40.    Defendant MSA Safety Inc. ("MSA/Globe"), f/k/a Mine Safety Appliances Company, is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia.  MSA has its principal place of business in Cranberry Township, Pennsylvania.  MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.  MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

41.    Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in Virginia. MES has its principal place of business in Sandy Hook, Connecticut. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

42.    Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. PBI has its

principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

43.    Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

44.    Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

45.    Defendant The Chemours Company, LLC ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and

products containing PFAS in turnouts, including in Virginia and in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

46.    Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in the counties of Arlington, Henrico, and Accomack, and in the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach.

## JURISDICTION AND VENUE

47.    This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1(A)(1)–(4), as the cause of action arises from the foreign Defendants' transacting business in Virginia, contracting to supply services or things in Virginia, causing tortious injury by an act or omission in Virginia, and causing tortious injury by an act or omission outside of Virginia when they regularly conduct business in Virginia.

48.    This Court has general and specific jurisdiction over Defendants, as they have purposefully availed themselves of the privileges of conducting business activities within Virginia through the marketing, sale, and distribution of products and services in Virginia, and/or profiting from such activity; they have purposefully directed activities towards Virginia and Virginia residents; and this litigation results from injuries that arose out of those activities.

49.    This Court has general and specific jurisdiction over Defendants by virtue of their purposeful, continuous, systematic contacts, and general business purpose in Virginia.

50.    The Firefighter Plaintiffs' and Decedents' exposure and injuries, resulting from the acts of Defendants alleged herein, occurred within the Commonwealth of Virginia.

51.    Venue is proper in this Court under Va. Code § 8.01-262(2), (3) and (4).

## SUBSTANTIVE ALLEGATIONS

**A. The Firefighter Plaintiffs and Decedents' Use of and Exposure to PFAS-Containing Products**

52.    The Firefighter Plaintiffs and Decedents are eight firefighters who have served their respective counties and cities as firefighters, including Arlington County, County, Henrico County, Accomack County, Portsmouth, Norfolk, Hampton, and Virginia Beach. The Firefighter Plaintiffs and Decedents have worked in various fire stations, engine, truck, and specialized companies throughout the Commonwealth of Virginia for decades.

53.    As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, the Firefighter Plaintiffs and Decedents risked their life on a daily basis. They not only saved lives and homes but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare them for this enormously challenging work, the Firefighter Plaintiffs and Decedents wore turnouts and received extensive and ongoing training in fire suppression, fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

54.    The Virginia Beach Fire Department ("VBFD") serves the residents of Virginia Beach, Virginia by providing an all-hazard response service. Virginia Beach firefighters also provide emergency medical technicians ("EMT") and paramedics to the community. VBFD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

55.     The Norfolk Fire-Rescue Department ("NFRD") has served the residents of Norfolk, Virginia for over 100 years.  Norfolk firefighters are cross-trained fire and emergency service ("EMS") providers.  The NFRD protects the city's residents, workers, and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

56.     The Accomack County Fire & Rescue Department, composed of a variety of smaller departments serving the greater Eastern Shore area, provides fire and emergency services to residents.

57.     The Portsmouth Fire Department ("PFD") serves the residents of Portsmouth, Virginia by providing quality public safety services. Portsmouth firefighters also provide disaster management, emergency medical services, fire and medical prevention, and fire suppression. PFD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

58.     The Airport Authority has served the Ronald Reagan Washington National and Washington Dulles International Airports since 1987.  Airport Authority firefighters are cross-trained fire and emergency medical service ("EMS") providers.  The Airport Authority protects tourists and residents alike through striving to prevent incidents that compromise the safety of those working and visiting the airport campuses.

59.     The Walter Reed Fire Department is part of the Arlington County Fire Department, serving as Fire Station 9.  The Walter Reed Fire Department provides fire suppression, technical rescue, fire prevention, education, pre-hospital care, and transportation services to the community.

60.    The Henrico County Division of Fire ("HCDF") serves the residents of Henrico County, Virginia by responding annually to over 55,000 calls for service.  The HCDF provides services to residents handling issues in all kinds of buildings (residential, commercial, and industrial), alongside rendering services where needed on the four major roadways that pass through the county: I-64, I-95, I-295, and I-895.  HCDF firefighters also provide emergency medical services and advanced life support services to those in need.

61.    The Hampton Division of Fire & Rescue ("HDF") is a combination fire and rescue organization – the first of its kind in Virginia to hold a Class 1 rating from the Insurance Services Office and be fully accredited with the Commission on Fire Accreditation International and the Center for Public Excellence.  The HDF's service to the local community dates back to 1884 and they have provided diligent fire suppression, emergency medical services, fire prevention, investigations, code enforcement, water rescue, and hazardous materials mitigation services to the City of Hampton's residents since.

62.    For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed turnouts containing PFAS to firefighters, firefighting training facilities, and fire departments globally, including within the Commonwealth of Virginia,  the counties of Arlington, Henrico, and Accomack, the cities of Portsmouth, Norfolk, Hampton, and Virginia Beach, and neighboring communities in Virginia.

63.    With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts.

### (1) PFAS-Containing Turnout Gear

64.    Defendants knew or should have known that during firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

65.    A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters using these brands of turnout gear, which included the Firefighter Plaintiffs and Decedents.

66.    In May 2023, Section 338 of the William M. Thornberry National Defense Authorization Act for titled the "Guaranteeing Equipment for Safety for Firefighters Act of 2020," directed the National Institute of Standards and Technology ("NIST") to identify the type, prevalence and concentration of PFAS in unused firefighter turnout gear. The study specifically looked at twenty textiles used to make firefighter turnout gear. The NIST study found between one and seventeen PFAS present in each textile used to construct the turnout gear.

67.    When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials

occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' cars and homes.

68.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980, internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

69.    As alleged herein, the Firefighter Plaintiffs and Decedents wore turnouts in the ordinary course of performing their duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed them to significant levels of PFAS.

70.    The Firefighter Plaintiffs and Decedents did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing their duties. The turnout gear worn or used by the Firefighter Plaintiffs and Decedents did not contain labeling information saying that the gear contained PFAS, and similarly did not warn the Firefighter Plaintiffs and Decedents of the health risks associated with exposure to PFAS.

71.    Like many fire departments across the country, the Firefighter Plaintiffs and Decedents had a limited number of turnouts to wear for years and would wash their turnouts at home and/or in station machines along with their daily station wear uniforms.

**B. The Chemical Structure of PFAS Makes Them Harmful to Human Health**

72.    PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. Indeed, scientists are unable to estimate an environmental half-life (i.e., the time it takes for 50% of the chemical to disappear) for PFAS. Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.

73.    PFAS are nearly indestructible and are highly transportable. PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.

74.    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020, shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS. For example, short-chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly has a shorter half-life than other PFAS, recently has been found to accumulate in the lungs and, in turn, increase the severity of COVID-19 in patients with elevated levels of PFBA, among other health concerns. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.

75.    In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant

Chemours GenX chemicals are ***more toxic*** than PFOA - the highly toxic chemical these were intended to replace.

76.    To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.

77.    PFAS exposure affects nearly every system in the body. It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.

### C. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied, and/or Sold Toxic PFAS and/or Products Containing PFAS

78.    Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in turnout gear, throughout the United States and in Virginia.

79.    PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

80.    By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

81.     Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.

82.     Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.

83.     Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI and StedFast.

**D. Defendants Knew Exposure to PFAS Causes Serious Health Impacts**

84.     Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed internally within the companies, yet were never made public or shared with any regulatory agencies. Among the findings:

      a.  A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.

      b.  In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers. A year later, these results were replicated in studies with dogs.

c. In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."

d. In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.

e. By the end of the 1970s, studies performed by at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.

f. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.

g. By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

h. In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage. Another study of workers found a link between PFOA exposure and prostate cancer.

i. In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation. DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.

j. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.

85.     Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth

defects in humans exposed to PFAS. These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.

86.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, the Firefighter Plaintiffs and Decedents, or the public about the health impacts resulting from exposure to PFAS.

87.     In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

88.     However, 3M did not recall PFOS that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts and did so without any warning to firefighters or to the public concerning the fact that these turnouts contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

89.     By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

90.     In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

91.     Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

92.     As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, Plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS . . . The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.

93.    Defendants also pivoted with a new industry strategy. Defendants continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

94.    In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company). Undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, and distribute turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).

95.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.

96.    By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.

97.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described *supra* began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects

(including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

98.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.

99.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."

100.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."

101.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or

manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS. Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier. Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.

### E. Defendants Failed to Warn Firefighter Plaintiffs and Decedents of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe.

102.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

103.    Yet, Defendants **did not warn** the Firefighter Plaintiffs and Decedents that PFAS and Defendants' PFAS-containing turnouts used by Plaintiffs contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

104.    Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing turnouts, are safe and not harmful to humans or the environment.

105.    Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In just these  past few years, for example, Congress passed legislation to address PFAS in turnouts. The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH). And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co), shoe

companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.

### (1) Defendants Provide No Safety Warnings on Product Labels

106.    The turnouts containing PFAS or PFAS materials sold by Defendants in Virginia, and used by the Firefighter Plaintiffs and Decedents in training, emergency incidents, or in fire suppression during their firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

107.    Below are pictures of warning labels for turnouts manufactured, marked, sold and distributed by Defendants Honeywell International, Honeywell Safety, MSA/Globe and Lion. As depicted below, the labels make no mention of PFAS, do not advise that the turnouts contain PFAS or PFAS materials, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with other garments in home washing machines.





**(2) Defendants' Misrepresentations About PFAS Continue to this Day**

108.    Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts made with or containing PFAS.

109.    Defendants' misinformation campaign is long-standing and continues to this day. Some pertinent examples include:

    a.    2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-

out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. **However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.**" (Emphasis added).

b. 2018 – The National Fire Protection Association (which maintains committees on turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of the risks of wearing turnouts containing PFAS or PFAS-containing materials.

c. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she **absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."** (emphasis added)

110.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

111.    For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts was minimal to non-existent. The statement even encouraged firefighters to continue to wear turnouts, creating a false sense that these PFAS-containing turnouts were safe. The statement reads, in relevant part:

Importantly, PFOA use has been almost completely phased out in the US..... If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression

activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear….The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required….**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE…and regularly decontaminate their turnout gear.** IAFF will continue to monitor developments and update this fact sheet should new information become available.

112.    The IAFF maintained the Defendants' position that the turnout gear was safe until new leadership took over in 2021. Because of these and other false claims and misrepresentations on the part of Defendants, the Firefighter Plaintiffs and Decedents did not know and, in the exercise of reasonable diligence, could not have known that the turnouts they used contained PFAS or PFAS-containing materials, and caused the Firefighter Plaintiffs and Decedents to be exposed to PFAS and/or PFAS-containing materials, leading to their various cancers and in the Decedents' cases, death.

113.    Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

F.   **New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts — But Defendants Continue to Discount or Deny These Risks**

114.    In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by

six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell over several production years, as listed below:

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

115. The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers." According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear." The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."

116. These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

Environmental Science & Technology Letters     pubs.acs.org/journal/estlcu     Letter

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC–MS/MS Analysis

| value in ppb | Jacket 2008 unused | | | pants 2014 used | | | Jacket 2008 used | Jacket 2017 unused |
|---|---|---|---|---|---|---|---|---|
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 125 | 104 | 139 | 615 | 215 | 205 | 951 |
| PFPeA | <MDL | 216 | 175 | 128 | 106 | 264 | 181 | 205 |
| PFHxA | <MDL | 505 | 365 | 199 | 286 | 309 | 353 | 365 |
| PFHpA | <MDL | 214 | 254 | 185 | 502 | 223 | 143 | 254 |
| PFOA | 71 | 44 | 182 | 850 | 51 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 82 | 253 | 195 | <MDL | 276 | <MDL |
| PFDA | 298 | 651 | 551 | 133 | <MDL | <MDL | 227 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 796 | <MDL | <MDL | 253 | <MDL |
| PFDoA | <MDL | 501 | <MDL | 616 | <MDL | <MDL | 259 | <MDL |
| PFBS | 213 | 140 | 142 | 53400 | 47900 | 1050 | 230 | 90400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 1 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 259 | 129 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 153 | <MDL | <MDL | <MDL | <MDL |

117.    "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory." The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen" and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."



Credit: *Environ. Sci. Technol. Lett.*

Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

118. Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."

119. Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

120. The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts. It does not, however, address that the maker's

turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW
ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PTFE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**
PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear

121.    Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Refuting a Fire Rescue magazine article about the study, Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear – not nearly enough to cause concern, and in amounts similar to consumer products." Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible published scientific research papers." Finally, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."

122.    And yet, Lion concedes that dermal absorption is a pathway of exposure to cancer causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that currently appears on the company's website, Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your

skin absorbs. This statistic is alarming given that the core body temperature of firefighters routinely increases during firefighting activities while wearing turnouts which contain known carcinogens.



123.    The IAFF holds a yearly cancer summit and yet has done little to address the PFAS in turnouts.  Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the IAFF Cancer Summit.



124.    At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to *other chemicals* encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the Defendants admitted that the PFAS materials in their turnouts have been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer...") while refusing to take any responsibility for continually exposing firefighters to carcinogens in their protective gear.

125.    The Firefighter Plaintiffs and Decedents deserved more. Firefighters are the first to respond to emergencies faced by their community and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, they always put the community first. When a child is drowning in a pool or a family is caught in a burning house, firefighters do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

## COUNT I | BREACH OF IMPLIED WARRANTIES

126.    This cause of action is asserted against all Defendants.

127.    Plaintiffs incorporate by reference all allegations asserted in this Complaint, as though fully set forth herein.

128.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and through that conduct have knowingly placed PFAS-containing turnouts into the stream of commerce with full knowledge that they were sold to firefighters, fire departments, or to companies that sold turnouts to fire departments for use by firefighters, such as the Firefighter Plaintiffs and Decedents, who were exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

129.    Defendants intended that the turnouts they were manufacturing, selling, distributing, supplying, promoting, and or selling would be used by firefighters, including the Firefighter Plaintiffs and Decedents, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants. Turnouts were not safe for use by firefighters even when used as directed by the manufacturer and for its intended purpose for firefighting activities which include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

130.    Further, knowing of the dangerous and hazardous properties of turnouts, Defendants could have manufactured, marketed, distributed, and sold alternative designs or formulations of turnouts that did not contain PFAS.

131.    These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

132.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Firefighter Plaintiffs and Decedents caused by the Defendants' manufacture, marketing, and sale of PFAS-containing turnouts.

133.    Additionally, the turnouts that were designed, manufactured, marketed, tested, advertised, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

134.    The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of turnouts.

135.    The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing turnouts left the hands of the manufacturer or distributors, said turnouts were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

136.    The turnouts were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing turnouts were defective and unsafe, especially when used in the form and manner as provided by Defendants.  In particular, Defendants' PFAS-containing turnouts were defective in the following ways:

        a.  When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation and as a result failed to meet ordinary

users' expectations as to their safety and failed to perform as an ordinary user would expect.

b.  When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

c.  When placed in the stream of commerce, Defendants' PFAS-containing turnouts were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

d.  When placed in the stream of commerce, Defendants' PFAS-containing turnouts contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

e.  When placed in the stream of commerce, Defendants' PFAS-containing turnouts did not provide an adequate warning of the potential harm that might result from exposure to PFAS and/or emitted from the turnouts and, alternatively, did not have adequate instructions for safe use of the products.

f.  Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

137.    Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

138.    The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

139.    The Firefighter Plaintiffs and Decedents used these PFAS-containing turnouts in the ways that Defendants intended them to be used.

140.    The Firefighter Plaintiffs and Decedents used these PFAS-containing turnouts in ways that were foreseeable to Defendants.

141.    The Firefighter Plaintiffs and Decedents were exposed to PFAS by using Defendants' turnouts in the course of their employment, as described above, without knowledge of turnouts' dangerous propensities.

142.    The design defect in turnouts containing PFAS exposed Plaintiffs to toxic levels of PFAS and therefore, was a substantial factor in causing Plaintiffs' various forms of cancers and Decedent Hutcheson's injuries and death as described herein.

143.    Through the use of advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including the Plaintiff, to their products by means of implied representations, statements, and descriptions that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

144.    In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, the Plaintiffs relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiffs complains as a result of probable, foreseeable, and ordinary uses of the product.

145.     At all times mentioned herein, the Defendants implied warranties of merchantability and fitness for a particular purpose in that the PFAS-containing turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time they left Defendants' possession.

146.     As a direct and proximate result of the foregoing acts and omissions, Plaintiffs suffered the injuries and damages described herein.

147.     Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

### COUNT II | BREACH OF EXPRESS WARRANTIES

148.     This cause of action is asserted against all Defendants.

149.     Plaintiffs incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

150.     Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts containing PFAS or PFAS-containing materials therein and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments, firefighters, or to companies that sold turnouts to fire departments for the use by firefighters such as the Firefighter Plaintiffs and Decedents, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

151.    The turnouts complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and they were exposed to PFAS while using turnouts in the ordinary course and as part of performing their duties as firefighters.

152.    Defendants expected that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including the Firefighter Plaintiffs and Decedents, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants.

153.    Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling turnouts containing PFAS was hazardous to human health.

154.    The potential risks of using PFAS-containing turnouts presented a substantial danger to firefighters, including the Firefighter Plaintiffs and Decedents, when the turnouts were used or worn in an intended or reasonably foreseeable way.

155.    The Firefighter Plaintiffs and Decedents wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing their duties as a firefighter.

156.    The turnouts manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

157.    Defendants' products were in a defective condition and unreasonably dangerous, in that turnouts which, by design, contain PFAS or PFAS-containing products, were deleterious, toxic, and highly harmful to the Firefighter Plaintiffs and Decedents.

158.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

a.  Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnouts;

b.  Did not have adequate instructions for safe use of the products;

c.  Did not have warnings to persons, such as the Firefighter Plaintiffs and Decedents, who had been, or reasonably may have been, exposed to Defendants' turnouts, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d.  Did not manufacture, market, promote, distribute, or sell reasonably comparable products not containing PFAS when it became feasible to design.

159.  At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts containing PFAS, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

160.  At all relevant times, Defendants' turnouts did not contain an adequate warning or caution statement, which was necessary.

161.  The Firefighter Plaintiffs and Decedents were unaware of the defective and unreasonably dangerous condition of Defendants' PFAS-containing turnouts at a time when such products were being used for the purposes for which they were intended, and the Firefighter Plaintiffs and Decedents were exposed to PFAS released from the Defendants' turnouts.

162.    The Firefighter Plaintiffs and Decedents did not and could not have known that the use of turnouts in the ordinary course of performing their duties as a firefighter could be hazardous to their health, bio-accumulate in the blood, and cause serious health effects, including cancer.

163.    Defendants knew that the use of turnouts, even when used as instructed by Defendants, subjected the Firefighter Plaintiffs and Decedents and others to a substantial risk of harm and yet, failed to adequately warn the Firefighter Plaintiffs and Decedents, the EPA or the public.

164.    As a result of their inadequate warnings, Defendants' turnouts were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by the Firefighter Plaintiffs and Decedents.

165.    The lack of adequate and sufficient warnings was a substantial factor in causing the Firefighter Plaintiffs cancers and Decedent Hutcheson's cancer and death, as described herein.

166.    Through the use of such advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including the Firefighter Plaintiffs and Decedents, to their products by means of express and implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

167.    In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, the Firefighter Plaintiffs and Decedents relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness

for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff complains as a result of probable, foreseeable, and ordinary uses of the product.

168.    At all times mentioned herein, the Defendants breached express warranties in that the PFAS-containing turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were defective and unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time it left Defendants' possession contrary to express representations made by Defendants regarding the PFAS-containing turnouts safety and or lack of or absence of harmful substances such as PFAS.

169.    As a direct and proximate result of the foregoing acts and omissions, the Firefighter Plaintiffs and Decedents suffered the injuries and damages described herein.

170.    Defendants acted with willful or conscious disregard for the rights, health, and safety of the Firefighter Plaintiffs and Decedents, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

### COUNT III | NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS AND WILLFUL AND WANTON MISCONDUCT

171.    This cause of action is asserted against all Defendants.

172.    Plaintiffs incorporate by reference all allegations asserted in this Complaint.

173.    Defendants owed a duty of care towards the Firefighter Plaintiffs and Decedents that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of turnouts containing PFAS or PFAS-containing materials.

174.    Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users,

production of information materials, use and/or distribution of turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of the Firefighter Plaintiffs and Decedents and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

175.    Defendants had a duty to exercise reasonable care to ensure that turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of turnouts were not exposed to the likely harm posed by PFAS and/or in such a way as to ensure that the end users were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

176.    Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the turnouts. However, Defendants knowingly elected not to do so.

177.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing turnouts in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing turnouts and materials therein were hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

178.    Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling PFAS to be used in turnouts and PFAS-containing turnouts was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

179.    Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the PFAS-containing turnouts.

180.    At all times material, the Firefighter Plaintiffs and Decedents inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' turnouts.

181.    The Firefighter Plaintiffs and Decedents' exposure to Defendants' turnouts, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing turnouts, was harmful and substantially increased the risk of injuries to the Firefighter Plaintiffs and Decedents and did cause injuries to the Firefighter Plaintiffs and Decedents.

182.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling turnouts containing PFAS or PFAS-containing materials therein would result in harm to the Firefighter Plaintiffs and Decedents as a result of using turnouts in the ordinary course of performing their duties as a firefighter.

183.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in turnouts, and/or Defendants' other acts and/or omissions as described in this complaint, could likely result in PFAS exposure to the Firefighter Plaintiffs and Decedents, the persistence and accumulation of toxic and harmful PFAS in their blood and/or body, and cause injuries to the Firefighter Plaintiffs and Decedents as herein alleged.

184.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in

PFAS exposure to the Firefighter Plaintiffs and Decedents by and through their foreseeable use of turnouts, resulting in the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and causing injuries to the Firefighter Plaintiffs and Decedents as herein alleged.

185.    Defendants, through their acts and/or omissions as described in this complaint, breached their duties to the Firefighter Plaintiffs and Decedents.

186.    It was reasonably foreseeable to Defendants that the Firefighter Plaintiffs and Decedents would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

187.    Defendants' acts and omissions amount to negligence, gross negligence, reckless disregard for human life and safety, and willful and wanton misconduct.

188.    As a direct and proximate result of the Defendants' acts and omissions, the Firefighter Plaintiffs and Decedents suffered injuries.

189.    Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including the Firefighter Plaintiffs and Decedents, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

### COUNT IV | VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT [VCPA], Va. Code § 59.1-196, *et seq.*

190.    This cause of action is asserted against all Defendants.

191.    Plaintiffs incorporate by reference all allegations asserted in this Complaint.

192.    Plaintiffs' claims arise under the Commonwealth of Virginia's Consumer Protection Act [VCPA], Va. Code § 59.1-196, *et seq.*

193.    Defendants are "suppliers" as that term is defined by the VCPA.

194.    The turnouts designed, developed, manufactured, marketed, distributed, released, and/or sold by Defendants the reached Firefighter Plaintiffs and Decedents as end users are "goods" as that term is defined by the VCPA.

195.    Defendants design, develop, manufacture, marketing, distribution, release, and/or sale of the turnouts into the chain of commerce and ultimately reaching Firefighter Plaintiffs and Decedents were consumer transactions as that term is defined under the VCPA. Va. Code § 59.1-198.

196.    Defendants, by and through their acts and omissions alleged *supra*, violated Sections 59.1-200(A)(5)(6) and (14) of the VCPA by

        a.  Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits, Va. Code § 59.1-200(A)(5);

        b.  Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

        c.  Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction, Va. Code § 59.1-200(A)(14).

197.    Defendants made various material misrepresentations to the general public regarding the attributes of turnouts and the dangers, or lack thereof, of PFAS chemicals for the purpose of inducing members of the general public to purchase their goods and rely on the safety of their goods.

198.    Defendants knew or should have known that the Firefighter Plaintiffs and Decedents would rely, and they did rely, on the material misrepresentations concerning the safety and quality of their turnouts.

199.    As a direct and proximate result of the Defendants' acts and omissions, the Firefighter Plaintiffs and Decedents suffered the injuries and death described herein.

200.    Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including the Firefighter Plaintiffs and Decedents, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

201.    Plaintiffs are also entitled to reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code § 59.1-204(B).

202.    Because the violations of the VCPA as alleged herein were willful, Plaintiffs are entitled to treble damages pursuant to Va. Code § 59.1-204(A).

## DAMAGES

203.    Plaintiffs incorporate by reference all allegations asserted in this Complaint.

204.    As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, Plaintiffs are entitled to recover punitive damages and treble damages pursuant to Virginia § 59.1-204(A).

205.    As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, the Plaintiff AMY L. HUTCHESON, Executrix of the Estate of JAMES S. HUTCHESON, deceased, incurred the following damages:

    a. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the Decedent Hutcheson;

    b. Compensation for reasonably expected loss of income of Decedent Hutcheson;

    c. Compensation for reasonably expected services, protection, care, and assistance provided by Decedent Hutcheson;

    d. Expenses for the care, treatment and hospitalization of Decedent Hutcheson; and

    e.  Reasonable funeral expenses; and

    f.  Other damages allowable at law.

206.    As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, the Plaintiffs ADEN W. SCOTT III, MARK C. DAVIS, EDWARD A. LANE, JEREMY M. POPE, CASEY BARDEN, AND JOHN HUDNALL incurred the following damages:

    a.  Bodily injuries, permanent in nature, which have affected their life;

    b.  Past, present and future physical pain and mental anguish;

    c.  Disfigurement and/or deformity coupled with associated humiliation and embarrassment;

    d.  Past, present and future inconvenience;

    e.  Past, present and future lost earnings, and a lessening of earning capacity;

    f.  Personal, social and financial limitations resulting from the injuries sustained by Plaintiffs; and

    g.  Other damages allowable at law, including medical expenses incurred in the past, present and future, and attorneys' fees and costs.

WHEREFORE, Plaintiffs respectfully move this Court for the following relief:

A.  Plaintiff Aden W. Scott III respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble

damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

B. Plaintiff Mark C. Davis respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

C. Plaintiff Edward A. Lane respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

D. Plaintiff Jeremy M. Pope respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable

attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

E.   Plaintiff Casey Barden respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

F.   Plaintiff John Hudnall respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

G.   Plaintiff Amy L. Hutcheson, Executrix of the Estate of James S. Hutcheson, deceased, respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages

or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

## TRIAL BY JURY DEMANDED

The Plaintiffs demand a trial with a jury on all issues in the cause, including liability and damages, and on any issue raised by this Complaint that involves any fact disputed by the Defendants and on any issue that may be raised by the Defendants that involves any fact disputed by the Plaintiffs.

Respectfully submitted,

Dated: April 15, 2025

Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren A. Martin | VSB No. 93653
Alexis Bale | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*